# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

OCTAVIUS JORDAN,

                    Plaintiff,

    v.                                  **Case No. 14-cv-987-pp**

MILWAUKEE COUNTY HOUSE OF CORRECTION,
ARMOR CORRECTIONAL HEALTH SERVICE INC.,
SUPERINTENDENT MICHAEL HAFEMANN,
AST. SUPERINTENDENT JOSE HERNANDEZ,
AST. SUPERINTENDENT KERRI MCKENZIE,[1]
OFFICER REBECCA GOSS, THOMAS GABLE,
NURSE FLOYD ELFTMAN, and NURSE MAI XIONG,

                    Defendants.

---

**DECISION AND ORDER GRANTING DEFENDANTS ARMOR CORRECTIONAL HEALTH SERVICE, INC., ELFTMAN, AND XIONG'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 40), GRANTING DEFENDANT DR. GABLE'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 45), GRANTING DEFENDANTS GOSS, HAFEMANN, HERNANDEZ, MCKENZIE AND MILWAUKEE COUNTY HOUSE OF CORRECTION'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 52), DENYING PLAINTIFF'S MOTION FOR LEAVE TO FILE SUR-REPLY (DKT. NO. 100), AND DISMISSING CASE**

---

[1] On August 25, 2015, the court stated that defendant "Unknown, sued as McKenzie or Hernandez Asst Sup, is correctly identified as 'Assistant Superintendent Jose Hernandez.'" Dkt No. 61 at 1 n. 2. Based on the summary judgment filings (Dkt. Nos. 52-60), which address the plaintiff's claims against former Unknown defendants Jose Hernandez *and* Kerri McKenzie, it appears that the court should have determined that defendant "Unknown, sued as McKenzie or Hernandez Asst Sup," was correctly identified as Asst. Superintendent Jose Hernandez *and* Asst. Superintendent Kerri McKenzie. Accordingly, the court has added Kerri McKenzie as a defendant.

1

The plaintiff is a Wisconsin state prisoner, representing himself. He filed this lawsuit under 42 U.S.C. §1983 alleging that, while confined at the Milwaukee County House of Correction, the defendants denied him adequate medical care for his asthma, arthritis, and back pain, and subjected him to cold cell temperatures. Dkt. No. 1. The defendants have filed motions for summary judgment. Specifically, defendants Armor Correctional Health Service Inc. ("Armor"), Floyd Elftman, and Mai Xiong filed a motion for summary judgment on August 19, 2015, Dkt. No. 40; defendant Dr. Thomas Gable filed a motion for summary judgment on August 20, 2015, Dkt. No. 45; and defendants Rebecca Goss, Michael Hafemann, Jose Hernandez, Kerri McKenzie, and Milwaukee County House of Correction ("HOC") filed a motion for summary judgment on August 25, 2015, Dkt. No. 52. For the reasons explained in this order, the court will grant the defendants' motions and dismiss this case.

## I.     The Defendants' Motions for Summary Judgment

### A.     Facts

#### 1.     *Preliminary Matter*

In this section, the court includes relevant facts from defendants Armor, Elftman, and Xiong's Proposed Findings of Fact (Dkt. No. 42), defendant Dr. Gable's Proposed Findings of Fact (Dkt. No. 47), and defendants Hafemann, Goss, McKenzie, Hernandez, and HOC's Proposed Findings of Fact (Dkt. No. 53). The plaintiff did not respond to Dr. Gable's proposed facts or to Hafemann,

2

Goss, McKenzie, Hernandez, and HOC's proposed facts. Thus, these facts are undisputed for summary judgment purposes. See Civil L.R. 56(b)(4) (E.D. Wis.). The plaintiff did file a response to Armor, Elftman, and Xiong's proposed facts. Most of his responses, however, did not cite to the record as required. See Fed. R. Civ. P. 56(c)(1), 56(e); Civil L.R. 56(b)(2)(B) (E.D. Wis.).

The plaintiff filed his own Proposed Findings of Fact. Dkt. No. 86. Most of these proposed facts do not cite to admissible evidence in the record; for that reason, the court will not consider those facts in its discussion below. See Fed. R. Civ. P. 56(c)(1); Civil L.R. 56(b)(2)(B)(ii) (E.D. Wis.). Some of the plaintiff's proposed facts cite to the defendants' evidentiary materials and/or proposed facts. The court will not consider these proposed facts in this section because they do not provide any additional facts that require the denial of summary judgment. See Civil L.R. 56(b)(2)(B)(ii) (E.D. Wis.). Finally, some the plaintiff's proposed facts cite to evidentiary materials that do not support the fact he asserts. The court also will not consider such proposed facts.

### 2.    *Parties*

The plaintiff was incarcerated at the HOC from October 22, 2013 until January 13, 2014. Dkt. No. 42 ¶ 2; Dkt. No. 47 ¶ 3; Dkt. No. 53 ¶¶ 2-3.

Defendant Floyd Elftman was employed as a nurse practitioner at the HOC at all times relevant. Dkt. No. 42 ¶ 1.

In the complaint, the plaintiff alleged that sometime between November of 2013 and January 13, 2014, Dkt. No. 1 at 7, the plaintiff had an asthma

3

attack, and defendant Xiong (who was working in the Health Services Unit at the time) told the reporting officer that there was nothing medical services could do, and that there was nothing in the plaintiff's file requiring him to be given a breathing treatment, id. at 8-9. He also alleged that defendant Xiong never had him taken to HSU or came to his dorm to evaluate him. Id. at 9. According to the proposed findings of fact presented by defendants Armor Correctional Health Services, Nurse Practitioner Floyd Elftman, and Nurse Mai Xiong, however, the medical records regarding the plaintiff's contact with medical staff during the relevant time period reveal that defendant Xiong "never was recorded as seeing or making any decisions relative to" the plaintiff's care. Dkt. No. 41 at 2.

Defendant Dr. Thomas Gable is a doctor of osteopathic medicine. Dkt. No. 47 ¶ 5. At all times relevant to this case, he was employed by Armor Correctional Health Care, an agency that provided health care services to the Milwaukee County Jail and the HOC. Id. ¶ 7. Between October 22, 2013 and November 25, 2013, Dr. Gable was the acting medical director at the Milwaukee County Jail. Id. ¶ 9. Dr. Gable did not have a supervisory role at the HOC at any time during the plaintiff's incarceration. Id. ¶ 11. Between October 22, 2013 and January 13, 2014, Dr. Gable occasionally was the on-call physician for the HOC. Id. ¶ 12. He was transferred to the HOC the second week of January of 2014 to work as a staff physician. Id.¶ 15.

Defendant Michael Hafemann is the superintendent of the HOC. Dkt. No. 53 ¶ 4. Defendant Kerri McKenzie is the assistant superintendent for operations for the HOC. Id. ¶ 5. Defendant Jose Hernandez is the assistant superintendent for programming at the HOC. Id. ¶ 6. Defendant Rebecca Goss was, at the times relevant to the complaint, a correctional officer at the HOC; she now works as a case manager at the Milwaukee County Jail. Id. ¶ 7. Defendant HOC is a Milwaukee County department. Id. ¶ 8.

3. *Facts Regarding Medical Care Claim*

Upon his intake to the HOC on October 22, 2013, the plaintiff was prescribed Acetaminophen 325 mg, three times a day, for his chronic arthritis and back pain. Dkt. No. 42 ¶ 3. The plaintiff's asthma status was tested upon intake. Id. ¶ 4. His peak flow values were 550, 600 and 600. Id. The plaintiff was placed on asthma protocol as needed. Id. ¶ 5. Normal peak flow values for a forty-seven-year-old, six-foot-tall male are in the range of 554-593. Id. ¶ 6.

On October 23, 2013, defendant Elftman prescribed Naproxen 375 mg, twice a day, for the plaintiff's back pain. Id. ¶ 7. At that visit, the plaintiff described his asthma condition as having been diagnosed thirteen years ago. Id. ¶ 8. He reported that his symptoms included shortness of breath, that he took Albuterol occasionally but had no current "prescriber" for Albuterol, that his last emergency room visit for asthma was approximately one year ago, that he had been hospitalized for asthma in 2008, that he'd never needed an intubation, and that he was awakened by his symptoms three to four times

5

monthly. Id. At that time, the plaintiff's pulse oxygen ratio was 99%. Id. ¶ 9. Normal pulse oximeter readings are 95% to 100%. Id. ¶ 10. Two days later, the plaintiff asked to be prescribed Gabapentin, stating that the Naproxen was not working. Id. ¶ 11.

On October 28, 2013, the plaintiff was seen by a nurse, who explained the medication prescribed and who made sure he was given the dose he had missed that morning. Id.¶ 12. That same day, defendant Elftman changed the order for the plaintiff's back pain medication, and added Carbamazepine, 200 mg twice a day, to the Naproxen. Id. ¶ 13.

On November 5, 2013, the plaintiff was given the flu vaccine. Id. ¶ 14. On November 6, 2013, the plaintiff made a sick call request for a sudden, two-week duration onset of neck pain and tingling to his fingers. Id. ¶ 15. Defendant Elftman saw the plaintiff on November 8, 2013, at which time the plaintiff also complained of hard stools. Id. ¶ 16. A stool softener was ordered for the plaintiff. Id. ¶ 17.

By November 11, 2013, the plaintiff began refusing his doses of Carbamazepine. Id. ¶ 18. On November 13, 2013, the medical records report that the plaintiff missed five doses in seven days, and that he requested the medication to be discontinued because it was not helping his back and he did not want it any longer. Id.¶ 19.

Starting November 15, 2013, the plaintiff began complaining of a cough and cold. Id. ¶ 20. That day, he was evaluated; his lungs were clear and his

6

vital signs normal, his pulse oxygen was 99%, and he was observed to have a dry cough. Id. ¶ 21. The same day, defendant Elftman ordered Guaifenesin cough syrup for his symptoms. Id. ¶ 22. Dr. Gable's name is hand-written underneath the November 15, 2013, order for cough syrup by defendant Elftman, but Dr. Gable's proposed findings indicate that the notation was not made in his handwriting, and that he was not the individual who ordered the cough syrup on that date. Dkt. No. 47 ¶ 26.

Also on November 15, 2013, an appointment request to see defendant Elftman was recorded, because the plaintiff's medications for his upper neck and spine pain were not working. Dkt. No. 42 ¶ 23.

The first time the plaintiff made any complaint about his asthma or breathing was a November 16, 2013 sick call request, stating that his asthma was flaring up and that he had been asking for an inhaler since October 25, 2013, but had not received one. Id. ¶ 24. There was, however, no record of the plaintiff having requested on inhaler on that date, id. at 25, and two days earlier, on October 23, 2013, defendant Elftman had made a note that the plaintiff's asthma had not been confirmed, id. at 26.

On November 16, 2013, the plaintiff was seen by a nurse for an evaluation of his complaints regarding shortness of breath. Id. ¶ 28. The nurse noted that there was "a risk of ineffective air exchange due to frequent dry cough, expiratory wheezing heard in both lungs but that no signs or symptoms of shortness of breath were observed or reported." Id. ¶ 29. The plaintiff's pulse

oxygen ratio was found to be 98%, within normal. Id. ¶ 30. An appointment was made for the plaintiff to see defendant Elftman. Id. ¶ 31.

On November 18, 2013, defendant Elftman evaluated the plaintiff. Id. ¶ 32. The plaintiff told defendant Elftman that he did not want Carbamazepine because it was not helping his back pain, id. ¶ 33, and defendant Elftman discontinued the prescription for that drug, id. The plaintiff reported that he had suffered a cough and congestion for four days. Id. ¶ 34. His vital signs were normal. Id. ¶ 35. He was observed to have mild congestion in his nose, and his right ear showed signs of congestion. Id. ¶ 36. The plaintiff's respiration rate was normal and his lungs were clear to auscultation. Id. ¶ 37. The plaintiff was diagnosed with a viral syndrome, was encouraged to rest, was told to take Naproxen as needed; a cough syrup with an expectorant was reordered for five additional days. Id. ¶ 38.

On November 21, 2013, correctional officers notified Nurse Melissa Wynstra and the charge nurse on duty that the plaintiff reported that he had "had an asthma attack, but is better now and is just coughing." Id. ¶ 39. The plaintiff later reported through the correctional officers that "Dr. Floyd [Nurse Practitioner Floyd Elftman] told him that if he had troubles breathing that he would get breathing treatments." Id. ¶ 40. The nursing staff noted that the plaintiff had just been seen by a nurse practitioner for cough and congestion, and that while he had had cough syrup prescribed, he'd received no other medication orders. Id. ¶ 41. The plaintiff was advised, without being seen, to fill

8

out a sick call request if he had any further respiratory problems. Id. ¶ 42. On the same day, the plaintiff filled out a sick call request stating, "I had an asthma attack at 1:00 am and I was refuse treatment. I want to see Floyd [Nurse Practitioner Floyd Elftman]. Also my right hand is numb from my shoulder on down. It tingles and I have problems holding items." Id. ¶ 43.

On November 23, 2013, Nurse Gloria Beal saw the plaintiff for a nursing assessment, which revealed that the plaintiff's vital signs were normal, his lungs were clear to auscultation in all fields, his pulse oxygen was 99, and that he complained of a headache. Dkt. No. 47 ¶ 27. A notation was made that he last used an Albuterol inhaler in October 2013. Id. ¶ 28. The plaintiff was observed to have a frequent cough of the "non-productive, dry hackey type," and was diagnosed with an altered respiratory status; the cough syrup was requested to be renewed, along with a referral to the nurse practitioner, as needed. Id. ¶ 29. That same day, Dr. Gable ordered a refill of cough medicine with an expectorant for the plaintiff, upon Nurse Beal's request. Id. ¶ 30. An appointment was made for the plaintiff to be seen by a physician. Id. ¶ 31.

On November 26, 2013, the plaintiff was seen by Masoor Munim, M.D., for back pain, ear itching, and asthma. Dkt. No. 42 ¶ 55. A history was taken and the plaintiff was examined. Id. ¶ 56. Dr. Munim's diagnosis was an outer left ear infection, chronic back pain with numbness and tingling, and possible neuropathy. Id. ¶ 57. The plaintiff was prescribed Gabapentin, Albuterol, and ear drops. Id. ¶ 58. A follow-up appointment with Dr. Munim was scheduled for

9

December 26, 2013. Id. ¶ 59. Health care records from an outside hospital were obtained to confirm the plaintiff's asthma. Id. ¶ 60. Those records indicated that at the time of treatment—December 4, 2011—the plaintiff was on Neurontin for nerve pain, Albuterol, Trazodone, and Remeron. Id. ¶ 61.[2]

On December 18, 2013, the plaintiff complained of flu-like symptoms. Id. ¶ 67. A nasal swab and throat culture were obtained. Id. ¶ 68. His pulse oxygen was 100%. Id. ¶ 69.

On December 19, 2013, defendant Elftman ordered two tablets of Acetaminophen 500 mg daily to be alternated with the plaintiff's Naproxen medication. Id. ¶ 70. That same day, the lab results from the nasal swab confirmed Type A influenza. Id. ¶ 71. Because the plaintiff had suffered symptoms for longer than forty-eight hours, he was not eligible for Tamiflu. Id. ¶ 72. The plaintiff was moved to an isolation pod because of the diagnosis. Id. ¶ 73.

On December 20, 2013, the plaintiff complained to Vicki Dembowski, RN, the nursing supervisor, about his anger for being placed in isolation due to the flu. Id. ¶ 74. "He appeared generally well, was afebrile with normal pulse and respiration." Id. ¶ 75. Later that same day, Jeanne Chichacki, LPN, found the plaintiff did not have a fever. Id. ¶ 76. The plaintiff complained again about

_____

[2] The records indicate that the plaintiff had other medical issues—a laceration on his finger, a filling falling out of a tooth, between November 26 and December 18, id. at ¶¶ 62-66; those events are not relevant to the claims in the plaintiff's complaint.

10

being placed in isolation, stating, "I don't know why they put me here everyone is contagious." Id. ¶ 77.

On December 23, 2013, the plaintiff's throat culture results were reported; he had strep throat. Id. ¶ 78. He was prescribed penicillin for ten days and cough medicine was reordered. Id. ¶ 79.

On December 25, 2013, the plaintiff placed a sick call request, indicating that he needed to see the doctor because the tingling in his spine had increased throughout his upper body. Id. ¶ 80.

The next day, on December 26, 2013, Dr. Munim saw the plaintiff. Id. ¶ 81. The plaintiff reported that he still had back pain and now had tingling sensation in his right upper extremities, and that he used Gabapentin 600 mg at home. Id. ¶ 82. Dr. Munim examined him without finding any abnormalities. Id. ¶ 83. Dr. Munim increased the dose of Gabapentin from 300 mg to 600 mg three times a day. Id. ¶ 84.

On December 31, 2013, the plaintiff made a sick call request, asking to be retested for strep throat. Id. ¶ 85. That request was denied unless the plaintiff's symptoms indicated a need for a retest. Id.

          a.     Dr. Gable's Involvement in Medical Care Claim

Dr. Gable's only involvement in the plaintiff's medical care was when, after being asked to do so by Nurse Gloria Beal after she'd conducted a nursing evaluation of the plaintiff, he placed a November 23, 2013 order to refill cough medicine with expectorant for the plaintiff. Dkt. No. 47 ¶ 33. Dr. Gable was not

11

involved in the care and treatment of the plaintiff even after Dr. Gable transferred to the HOC as a staff physician in early January, 2014. Id. ¶ 39.

> b. Hafemann, McKenzie, Hernandez, and Goss's Involvement in the Plaintiff's Medical Care Claim

Milwaukee County has a policy and practice to provide inmates housed at the HOC with medical care and to respond to inmate requests for medical attention. Dkt. No. 53 ¶ 75. While in Milwaukee County custody at the HOC, inmates may request medical care by completing a request form. Id. ¶ 76. In the event of a medical emergency observed by a corrections staff member or reported by an inmate, officers also may directly request that the on-site medical professionals respond and/or call for outside emergency health care providers to respond. Id. ¶ 77.

Defendants Hafemann, McKenzie, Hernandez and Goss—each of whom either were supervisors or correctional officers—did not participate directly in the delivery of medical care to inmates. Id. ¶ 78. They also did not participate in medical judgments or other decision-making regarding inmate health care. Id. ¶ 79. Defendants Hafemann, McKenzie, Hernandez and Goss depended on the medical judgments made by the medical professionals in providing medical care to HOC inmates. Id.¶ 81. During the plaintiff's detention, defendants Hafemann, McKenzie, Hernandez, and Goss were not medical care providers and did not participate in the diagnosis or treatment decisions regarding plaintiff's medical care for asthma, arthritis, back pain, or other medical conditions. Id. ¶ 82. Neither Milwaukee County nor the individual movants

maintain a policy or practice of using breathing treatments over inhalers to treat inmates' asthmatic conditions, for alleged cost savings or any other reasons. Id. ¶ 83.

4.    *Facts Regarding Conditions of Confinement Claim*

During the plaintiff's detention at the HOC, he was housed in a number of different housing units. Dkt. No. 53 ¶ 30. "Some of these housing units were, at the times relevant to the complaint, equipped with sensors that read housing unit temperatures and recorded the data in a computerized fashion."[3] Id. ¶ 31. Those sensors recorded specific housing unit temperatures for forty-four days of the plaintiff's eighty-four-day detention. Id. ¶ 33.

"Generally, the temperatures recorded in plaintiff's assigned housing units ranged between 70 and 77 degrees Fahrenheit." Id. ¶ 34. "Temperatures below 70 degrees Fahrenheit in the plaintiff's assigned housing units were recorded on only one date during the subject detention;" on October 24, 2013, in the E2 housing unit. Id. ¶ 35. Between 6:00 p.m. and 11:59 p.m. on that date, temperatures of 65 and 66 degrees Fahrenheit were recorded at four fifteen-minute intervals in the E2 housing unit, but the remaining temperatures during that time period were between 68 and 74 degrees. Id. ¶ 36.

_____

[3] All HOC housing units now are equipped with sensors that read housing unit temperatures and record the data in computerized fashion. Id. ¶ 32

The plaintiff's complaint alleged that there were "freezing cold" temperatures when he was living in "Dorm D-2 of the old building at the H.O.C.".[4] Dkt. No. 1 at 7. Computerized temperature data was not recorded for the D2 housing unit during the relevant time period. Dkt. No. 53 ¶ 38.

"At the relevant times, the D2 housing unit was warmed by six to eight radiators on each side of the dorm and the radiators were fed with steam heat supplied by three separate boilers." Id. ¶ 39. "Only a catastrophic event disabling all three boilers feeding the D2 housing unit temperatures could result in a dramatic reduction in housing unit temperatures." Id. ¶ 40. "No catastrophic event disabling the three boilers feeding steam heat to the D2 housing unit radiators occurred during the time periods at issue" in the complaint. Id. ¶ 41. If a catastrophic event or protracted repair by maintenance staff had occurred, the maintenance staff could advise HOC staff to move inmates out of a housing unit, or to provide them with extra clothing and blankets on a temporary basis, but no such "circumstances necessitated these steps during the plaintiff's subject detention." Id. ¶ 42. "The maintenance staff responsible for the heating system at the HOC does not recall ever having been called to investigate or respond to cold cell temperatures in the D2 housing unit; on the contrary, he has only been called to respond to reports that inmates or staff perceived the temperatures to be too warm." Id. ¶ 43.

---

[4] The plaintiff was housed in the D2 housing unit from October 25, 2013 – November 26, 2013; and on January 1, 2014. Dkt. No. 59 ¶ 19.

14

The plaintiff alleged in the complaint that sometime in December 2013, defendant Goss told him he had to take off his blanket or go to his bunk with it. When he tried to explain that he shouldn't have to stay in bed just to keep warm, the plaintiff alleged, defendant Goss had him placed in segregation for refusing to either remove the blanket or go to his bunk. Dkt. No. 1 at 11. On January 1, 2014, defendant Goss issued the plaintiff a Rules Violation Report for "disobeying verbal or written orders, disrupting orderly operation of the jail, and verbally/physically demonstrating disrespect." Dkt. No. 53 ¶ 45. The plaintiff was "refusing to take his blanket off in the dayroom." Id. ¶ 46. That day, defendant Goss had not received complaints from other inmates regarding the housing unit being excessively cold, and she did not observe the housing unit to be excessively cold. Id. ¶ 47. She would have contacted maintenance if she had received numerous complaints. Id. ¶48. Goss advised the plaintiff that if he wanted to use a blanket to feel warmer, he could do so in his bunk area. Id. ¶49. She explained to the plaintiff that inmates were not allowed to use blankets in the dayroom areas of the housing units for safety reasons. Id. ¶ 50. "Allowing an inmate to move about in the dayroom would present tripping hazards to the inmate and others"; "[a]n inmate wrapped in a blanket while in close proximity to other inmates" may be able to conceal a weapon or exchange contraband, or conceal an injury; and "[u]se of blankets outside of the bunk area also creates unnecessary wear and tear on HOC property and may

Case 2:14-cv-00987-PP   Filed 03/15/16   Page 15 of 40   Document 102

necessitate more frequent replacement and laundering of blankets." Id. ¶¶ 51-53.

The plaintiff refused to move to his bunk with his blanket, or to remove his blanket while he was in the dayroom. Id.¶ 54. The plaintiff was "basically protesting pleading placed in [the D2] housing unit and was protesting how cold it was in the housing unit." Id. ¶ 55. The plaintiff alleged that he asked to "speak with a Luetenant [sic] or someone about being moved because I get really sick really fast in cold conditions due to my asthma and bronchitis medical conditions." Id. ¶ 56. "Both defendant Goss and a responding lieutenant explained to the plaintiff that if he believed he had a medical need, he should submit a 'pink and white' form, the form used by inmates to request medical care," so that medical personnel could diagnose and treat his medical needs. Id. ¶¶ 57-58. The plaintiff "refused to submit a medical request form." Id.¶ 59.

"If defendant Goss had observed the plaintiff to be experiencing a medical emergency, she would have called for the on-site medical personnel or outside emergency medical personnel to respond; however, she did not observe and plaintiff did not communicate any need for an urgent medical response." Id. ¶ 60. "The plaintiff continued to refuse a direct order to either remove the blanket or move to his bunk," and defendant Goss issued him a Rules Violation. Id.¶ 61. The Rules Violation was sustained when plaintiff admitted to the violation. Id. ¶ 62.

16

The HOC provides inmates with a grievance procedure, but the plaintiff did not file any grievances concerning the allegedly cold housing unit temperatures. Id.¶ 63. "On one occasion, on November 15, 2013, the plaintiff mentioned to medical staff that 'the dorm gets cold at night.'" Id.¶ 64. Just eight days later—on November 23, 2013—while housed in the same unit, the plaintiff observed to medical staff that "the dorm is really hot." Id. ¶ 65.

Neither Milwaukee County nor the command or corrections staff of the HOC maintain a policy or practice of depriving inmates of adequate warmth. Id. ¶ 66. It is "the policy and practice of Milwaukee County to ensure the warmth and safety of [HOC] inmates." Id. ¶ 67. Housing officers remain with inmates in the housing units, thus they are personally aware of and subject to the temperatures in the housing units. Id.¶ 68. "At the times relevant to the Complaint, investigation of reportedly cold housing unit temperatures by maintenance staff included personally observing the temperatures, checking computerized temperature records, and/or measuring the housing unit temperatures with a laser thermometer accurate to within one degree." Id. ¶ 70. If the investigation by maintenance staff indicated that the temperature settings required adjustment, or that equipment was in need of repair, the maintenance staff would immediately take action to make the necessary adjustments or repairs. Id. ¶ 71.

17

a.   Hafemann, McKenzie, and Hernandez's Involvement in Conditions of Confinement Claim

As command staff, defendants Hafemann, McKenzie, and Hernandez did not personally participate in evaluating or responding to complaints that housing unit temperatures were too cold. Id.¶ 72. Hafemann, McKenzie, and Hernandez did not participate in evaluating or responding to any concerns by plaintiff regarding housing unit temperatures. Id. ¶ 73.

b.   Dr. Gable's Involvement in Conditions of Confinement Claim

Dr. Gable was not personally involved, either directly or indirectly, with the plaintiff's conditions of cell confinement while at the HOC. Dkt. No. 47 ¶ 45. Dr. Gable did not have knowledge of the plaintiff's conditions of confinement, or of any complaints he made regarding same. Id. ¶46.

B.   Discussion

1.   *Summary Judgment Standard*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A

18

dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

  2.  *Eighth Amendment Medical Care Claim*

    a.  Eighth Amendment Medical Care Law

"The Eighth Amendment safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" Arnett v. Webster, 658 F.3d 742, 750 (7th Cir. 2011) (quoting Rodriguez v. Plymouth Ambulance Serv., 577 F.3d 816, 828 (7th Cir. 2009); see also Estelle v. Gamble, 429 U.S. 97, 103 (1976)). Prison officials violate the Constitution if they are deliberately indifferent to prisoners' serious medical needs. Arnett, 658 F.3d at 750 (citing Estelle, 429 U.S. at 104). A claim based on deficient medical care must demonstrate two elements: 1) an

19

objectively serious medical condition; and 2) an official's deliberate indifference to that condition. <u>Arnett</u>, 658 F.3d at 750 (citation omitted). "'[D]eliberate indifference to serious medical needs' of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." <u>Rodriguez</u>, 577 F.3d at 828 (quoting <u>Estelle</u>, 429 U.S. at 104).

A medical need is considered sufficiently serious if the inmate's condition "'has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention.'" <u>Roe v. Elyea</u>, 631 F.3d 843, 857 (7th Cir. 2011) (quoting <u>Greeno v. Daley</u>, 414 F.3d 645, 653 (7th Cir. 2005)). "A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." <u>Gayton v. McCoy</u>, 593 F.3d 610, 620 (7th Cir. 2010) (citing <u>Reed v. McBride</u>, 178 F.3d 849, 852 (7th Cir. 1999)).

To demonstrate deliberate indifference, a plaintiff must show that the defendant "acted with a sufficiently culpable state of mind," something akin to recklessness. A prison official acts with a sufficiently culpable state of mind when he or she knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk. <u>Roe</u>, 631 F.3d at 857. A prison official cannot be found liable under the Eighth Amendment unless the official "'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn

that a substantial risk of serious harm exists, and he must also draw the inference.'" Gutierrez v. Peters, 111 F.3d 1364, 1369 (7th Cir. 1997) (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). "Deliberate indifference 'is more than negligence and approaches intentional wrongdoing.'" Arnett, 658 F.3d at 751 (quoting Collignon v. Milwaukee Cnty., 163 F.3d 982, 988 (7th Cir. 1998)). It is not medical malpractice; "the Eighth Amendment does not codify common law torts." Duckworth v. Ahmad, 532 F.3d 675, 679 (7th Cir. 2008)(citation omitted).

### b. The Parties' Arguments

Defendants Armor, Elftman and Xiong contend that the court should grant summary judgment to Xiong because she did not have contact with the plaintiff during the relevant time period, and was not responsible for his care. They argue that defendant Elftman's care and treatment of the plaintiff for his asthmatic condition, as well as for his arthritis and spinal pain, were reasonable and more than adequate. Finally, they assert that the court should dismiss the case against Armor because the plaintiff cannot establish that any policy or custom for which Armor is responsible contributed to the provision of deliberately indifferent health care.

Defendant Dr. Gable asks the court to grant summary judgment in his favor because he was not personally involved in the plaintiff's medical care.

Defendants Goss, Hafemann, Hernandez, McKenzie and the HOC first contend that the HOC is not a suable entity. They also argue that the plaintiff

21

cannot establish any official capacity claims against them. These defendants also assert that the plaintiff has not established any medical care claim against them in their individual capacities.

In response, the plaintiff says that he can maintain a deliberate indifference claim against defendants Elftman and Armor. He also responds that Elftman, Armor, Xiong, and Gable *were* personally involved in his medical care claims. Specifically, the plaintiff contends that Xiong, Elftman and Gable had the requisite personal involvement affecting his constitutional right to health care related to pain medication for his back pain. He further claims that Elftman, Xiong and Armor denied him care for his asthma.

### i. *Defendant HOC is not a suable entity*

The plaintiff's response did not address the HOC's claim that it was not a suable entity; the court concludes that the plaintiff has conceded that the HOC is not a suable entity under 42 U.S.C. §1983. That concession recognizes what the law holds. Section 1983 imposes liability on a "person" who violates a person's civil rights. The HOC is not a "person." The Supreme Court has held "that a local government [or, in this case, an agency of that government] may not be sued under §1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983." Monell v. Dept. of Social Servs. of City of New York, 436 U.S. 658, 694 (1978). The plaintiff has not alleged, or provided any evidence, that the HOC

Case 2:14-cv-00987-PP   Filed 03/15/16   Page 22 of 40   Document 102

had a policy or custom of denying inmates medical treatment or care. The court will grant summary judgment in favor of the HOC.

> ii. *The plaintiff has failed to submit proof that defendants Xiong, Goss, Hafemann, Hernandez and McKenzie were personally involved in the plaintiff's medical care claims.*

Section 1983 makes public employees liable "for their own misdeeds but not for anyone else's." Burks v. Raemisch, 555 F.3d 592, 596 (7th Cir. 2009); see George v. Smith, 507 F.3d 605, 609 (7th Cir. 2007). Only a defendant who is personally responsible for depriving the plaintiff of a constitutional right may be held liable under §1983. Grieveson v. Anderson, 538 F.3d 763, 778 (7th Cir. 2008).  If someone else has committed the act that resulted in the constitutional deprivation, then the defendant can be held personally responsible, and thus liable under §1983, only if he knows about the other person's act and has a realistic opportunity to prevent it, but deliberately or recklessly fails to do so. Lewis v. Downey, 581 F.3d 467, 472 (7th Cir. 2009).

The plaintiff did not address the defendants' arguments that the court should grant summary judgment in favor of defendants Hafemann, McKenzie, Hernandez, and Goss. And the undisputed facts show no evidence that these defendants had any personal involvement in the plaintiff's allegations that he did not receive proper medical care. Accordingly, the court will grant summary judgment in favor of these defendants on the deliberate indifference claim.

With regard to defendant Xiong, the plaintiff claims that she was personally involved in denying him medical care. Dkt. No. 84 at 10, 11. He

23

alleges that he complained to Xiong concerning his asthma, that she refused to provide him with an Albuterol inhaler, and that this refusal amounted to "a denial of a basic human need (medical care)." Dkt. No. 84 at 17. These allegations, however, are just that—the plaintiff's allegations. As the court discussed above, in order to prevail against a motion for summary judgment, the plaintiff must present some *evidence* that supports his allegations—medical records, an affidavit; something other than his allegations. The evidence that the defendants have provided does not reveal any evidence that the plaintiff complained to Xiong, or that Xiong denied the plaintiff's request for an inhaler. The plaintiff has provided no such evidence himself. Accordingly, the court will grant summary judgment in favor of defendant Xiong.

        iii.    *<u>The evidence does not support the plaintiff's claim that defendants Elftman and Dr. Gable were deliberately indifferent to the plaintiff's medical needs, or that defendant Armor was deliberately indifferent.</u>*

Because Nurse Practitioner Elftman and Dr. Gable are medical professionals, the law allows the court to find that they were deliberately indifferent only if their treatment decisions were "such a substantial departure from accepted professional judgment, practice, or standards . . . as to demonstrate" that they were not relying "on a professional judgment." <u>Youngberg v. Romeo</u>, 457 U.S. 307, 314 (1982) (citation omitted)); <u>see</u> <u>Sain v. Wood</u>, 512 F.3d 886, 894-95 (7th Cir. 2008); <u>Collignon</u>, 163 F.3d at 987-88. Conduct that is akin to criminal recklessness—but not medical malpractice,

24

negligence, or even gross negligence—violates the Eighth Amendment. See Estelle, 429 U.S. at 106; Farmer, 511 U.S. at 836; King v. Kramer, 680 F.3d 1013, 1018 (7th Cir. 2012).

> A prisoner may establish deliberate indifference by demonstrating that the treatment he received was "blatantly inappropriate." Greeno v. Daley, 414 F.3d 645, 654 (7th Cir. 2005) (quoting Snipes v. DeTella, 95 F.3d 586, 592 (7th Cir. 1996)). Making that showing is not easy: "A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" Sain v. Wood, 512 F.3d 886, 894-95 (7th Cir. 2008) (quoting Collignon v. Milwaukee Cnty., 163 F.3d 982, 988 (7th Cir.1998)). Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation. Johnson v. Doughty, 433 F.3d 1001, 1013 (7th Cir. 2006). The federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment. Roe v. Elyea, 631 F.3d 843, 857 (7th Cir. 2011); Sain, 512 F.3d at 895.

Pyles v. Fahim, 771 F.3d 403, 409 (7th Cir. 2014).

With respect to Dr. Gable, it is undisputed that his sole involvement in the plaintiff's medical care was that, on one occasion, at Nurse Beal's request, he placed an order for cough medicine for the plaintiff. There is no evidence that Dr. Gable examined the plaintiff, or made a diagnosis, or was asked to provide treatment that he refused to provide. There is no evidence that the plaintiff told Dr. Gable about any of his health issues during the relevant time period. There is no evidence that, other than ordering the cough medicine, Dr. Gable had any form of involvement in the plaintiff's medical care. Because

25

there is no evidence that Dr. Gable was involved in the plaintiff's treatment, or that he exhibited deliberate indifference to the plaintiff's medical needs, the court will grant summary judgment in favor of defendant Dr. Gable.

The plaintiff claims that defendant Elftman acted with deliberate indifference because he failed to provide the plaintiff with an Albuterol inhaler. According to the plaintiff, Elftman (and Armor) were put on notice that the plaintiff would have asthma attacks or that harm would come to him if he was not provided with an Albuterol inhaler to combat his asthma. The plaintiff further alleges that Elftman denied his request for an inhaler because Elftman did not believe that the plaintiff was an asthmatic. He asserts that Elftman (and Armor) did not apply their professional judgment to his medical condition, and instead turned a blind eye to the plaintiff's medical needs.

The plaintiff also contends that Elftman was deliberately indifferent to his pain, alleging that Elftman repeatedly denied the plaintiff anything other than over-the-counter medication for that pain. According to the plaintiff, he was not given anything other than Acetaminophen and two psychotropic medications prescribed for seizures. He also states that he was given "Tegretol (Carbamezapine)" and "Gabapentin (Neurontin)" as pain management medication, which did not relieve his upper neck and back pain. Dkt. No. 84 at 14. The plaintiff asserts that there was never a question that he was in severe pain, and that the defendants refused to give him adequate pain relief

26

medication because it was cheaper to provide him with over-the-counter medication.

Again, the plaintiff's assertions are just that—his own statements. The factual record provides no evidence that Elftman was deliberately indifferent to the plaintiff's medical needs. Specifically, with respect to the plaintiff's asthma/respiratory issues, Elftmann saw him two times. First, at the plaintiff's HOC intake on October 23, 2013, the plaintiff reported that he had asthma and that he took Albuterol occasionally, but that he didn't have a current prescription for it. At this intake appointment, the plaintiff's asthma status was tested, his values were normal, and he was placed on an asthma protocol as needed.

According to the medical records, the first time the plaintiff made any complaints about this asthma or breathing was almost a month later, on November 16, 2013, when he reported that his asthma was flaring up (although he did state at that appointment that he had been asking for an inhaler since October 25, 2013, but had not received one). The nurse made an appointment for the plaintiff to see Elftman. Two days later, at the November 18, 2013 appointment, Elftman observed that there was mild congestion in the plaintiff's nose and ear, that his respiration rate was normal, and that his lungs were clear to auscultation. He was diagnosed with a viral syndrome, and was prescribed cough medicine. The plaintiff did not see Elftman for his asthma condition after this appointment.

27

The plaintiff reported that he had had an asthma attack on November 21, 2013, but that he was feeling better at the time of the report and was only coughing. The plaintiff submitted a sick call request later that day, asking to see Elftman. Instead, two days later (on November 23, 2013), he saw Nurse Beal, who made an appointment for him to see a physician. The plaintiff saw Dr. Munim three days later, who, among other things, diagnosed the plaintiff with asthma and prescribed Albuterol. Dr. Munim obtained the plaintiff's outside medical records, which confirmed that he had been diagnosed with asthma before.

There is nothing in this history to support a conclusion that Elftman was deliberately indifferent to the plaintiff's medical needs, or that his care and treatment of the plaintiff were so far afield of accepted professional standards as to raise an inference that the plaintiff's care was based upon something other than medical or nursing judgment. The records demonstrate that the plaintiff received ongoing treatment, upon his request. There is no evidence in the record to support the plaintiff's claim that Elftman denied his request for an inhaler, or that Elftman did so because he (erroneously) didn't believe he had asthma. Even if the record did support a claim that Elftman refused to prescribe an inhaler because he did not believe that the plaintiff had asthma, "medical malpractice in the form of an incorrect diagnosis or improper treatment does not state an Eighth Amendment claim." Gutierrez, 111 F.3d at 1374 (doctor's incorrect assessment that cyst was not infected not actionable).

28

With respect to the plaintiff's pain medication: after the October 22, 2013, intake appointment, Elftman saw the plaintiff, or made orders for his pain issues, on five occasions: October 23, 2013, October 28, 2013, November 8, 2013, November 18, 2013, and December 19, 2013. Elftman initially started the plaintiff on over-the-counter pain medication (Naproxen), and when the plaintiff complained that this didn't relieve his pain, Elftman added Carbamazepine (an anti-convulsant used to treat seizures, neuralgia, and bi-polar disorder) to the regimen. When the plaintiff complained that the Carbamazepine wasn't working, Elftman discontinued that medication on November 18, 2013. Eight days later, on November 26, 2013, the plaintiff saw Dr. Munim, who prescribed the plaintiff Gabapentin, which was effective in treating the plaintiff's pain.

Elftman appears to have started the plaintiff on a conservative pain regimen, with increases and changes to the medication over the next month until the plaintiff saw a doctor. There is no evidence that Elftman's method constituted a substantial departure from accepted professional practice. See Pyles, 771 F.3d at 409. Absent evidence that Elftman was deliberately indifferent to the plaintiff's medical need, the court will grant summary judgment in favor of Elftman.

Nor has the plaintiff shown that Armor had a policy of denying HOC inmates medical treatment, or being deliberately indifferent to their medical needs. Indeed, the record shows that medical staff at the HOC promptly

29

responded to the plaintiff's requests, and adjusted his treatment when it appeared that that treatment was not effective. That the plaintiff did not receive the exact treatment he wanted when he wanted it does not, without more, violate the Constitution. See Budd v. Motley, 711 F.3d 840, 844 (7th Cir. 2013) (affirming dismissal of deliberate-indifference claim because plaintiff, although dissatisfied with treatment, "received medical attention, medication, testing, and ongoing observation").

In sum, the court will grant the defendants' summary judgment motions as to the plaintiff's medical care claims.

### 3. *Conditions of Confinement Claim*

#### a. Eighth Amendment Conditions of Confinement Law

The Eighth Amendment requires prison officials to "take reasonable measures to guarantee the safety of the inmates," Farmer v. Brennan, 511 U.S. 825, 832-33 (1994), and includes the right to adequate shelter and protection from "extreme" cold, Dixon v. Godinez, 114 F.3d 640, 642 (7th Cir. 1997). To prove an Eighth Amendment violation, the plaintiff would have to show that prison officials knew of and disregarded "'an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Boyce v. Moore, 314 F.3d 884, 888 (7th Cir. 2002) (quoting Farmer, 511 U.S. at 837).

30

Prison conditions may be uncomfortable and harsh without violating the Constitution. See Dixon, 114 F.3d at 642. The deprivations must be "extreme" for a plaintiff to succeed on a conditions-of-confinement claim. See Delaney v. DeTella, 256 F.3d 679, 683 (7th Cir. 2001). Minimal decency requires a prison to provide reasonably adequate protection from the cold. See Dixon, 114 F.3d at 643. In assessing whether cold cell temperatures constitute cruel and unusual punishment, courts consider several factors, including "the severity of the cold; its duration, whether the prisoner has alternative means to protect himself from the cold; the adequacy of such alternatives; as well as whether he must endure other uncomfortable conditions as well as cold." Id. at 644. No one factor or combination of factors, however, "is necessarily determinative of a claim's success or lack thereof." Id.

The Seventh Circuit Court of Appeals has found that the following conditions constitute a substantial risk of serious harm: temperatures in the cell averaging 40 degrees Fahrenheit and regularly falling below freezing for four consecutive winters, see id., 114 F.3d at 643; being stripped and put in a cold cell with no bed, mattress, pillows, blankets, heat or clothing for a week and a half, Murphy v. Walker, 51 F.3d 714, 720-21 (7th Cir. 1995); being housed in a cell with broken window in which the temperature was near outdoor temperature, including a period of two days where wind chills were from −40 to −50 degrees Fahrenheit, Del Raine v. Willford, 32 F.3d 1024, 1036 (7th Cir. 1994); and holding an inmate for four days in which the temperature

31

fell to –22 degrees Fahrenheit outside in a cell with broken windows, below-freezing temperatures inside the cell, no winter clothing, lack of extra blankets, and a malfunctioning heating system, Henderson v. DeRobertis, 940 F.2d 1055, 1056-1061 (7th Cir. 1991).

If a court finds that the conditions are objectively, sufficiently serious, the plaintiff must then demonstrate that the prison official acted with deliberate indifference to the prison conditions. See Wilson v. Seiter, 501 U.S. 294, 302 (1991); Townsend v. Fuchs, 522 F.3d 765, 773 (7th Cir. 2008). "Deliberate indifference" means that the prison official knew that the inmate faced a substantial risk of serious harm but disregarded that risk by failing to take reasonable measures to address that risk. See Farmer, 511 U.S. at 847; Townsend, 552 F.3d at 773.

### b.    The Parties' Arguments

Defendant Dr. Gable asks the court to grant him summary judgment on the plaintiff's conditions of confinement claim because, again, he was not personally involved in the circumstances the plaintiff describes.

Defendants Hafemann, Goss, McKenzie and Hernandez argue that the plaintiff cannot establish any official capacity claims against them. They also contend that the plaintiff cannot establish conditions of confinement claims against them in their individual capacities. These defendants further contend that they are entitled to qualified immunity, and that the plaintiff's claims for injunctive relief are moot.

32

The plaintiff responded that the defendants subjected him to unconstitutionally cold cell temperatures. He asserted that the HOC units where he was housed were, at all times relevant to this lawsuit, extremely cold indoors with subfreezing-like temperatures.

i. *The plaintiff has presented no evidence that defendants Armor, Elftman, Xiong or Dr. Gable were involved in the alleged conditions surrounding the temperature in his housing unit.*

The plaintiff's complaint discusses these defendants only in relation to his claim of deliberate indifference to medical need. The court will grant summary judgment in favor of these defendants on the conditions-of-confinement claim.

ii. *The plaintiff has not presented evidence that defendants Hafemann, Hernandez or McKenzie acted with deliberate indifference.*

In his affidavit/declaration in response to the defendants' motions for summary judgment, the plaintiff avers:

In October of 2013 the weather conditions started to become extremely cold outside and due to this the Dorms where I was being housed were freezing cold to the point where you could see ice forming on the windows and you could see your breath in puffs of vapor from the extreme cold.

I became sick due to the extreme coldness from the unit and cold virus, and influenza passed around from other inmate getting sick, which exacerbate the sickness throughout the facility.

Due to having become sick from the coldness which caused my asthmatic condition flare up with three (3) different episodes of

33

attacks during the time I was living in Dorm-2 of the Old Building at the HOC.

I filed numerous grievances concerning the cold temperatures and requested to be moved off that dorm because it was so cold and causing my health to fail. I was not moved until after all my complaints were ignored.

Dkt. No. 84 ¶¶ 22-25. The plaintiff submitted affidavits from three inmates who attested that it was cold at the HOC: Dominic Cloyd, Courtney B. Williams, and Raymond Todd Johnson. Dkt. Nos. 70-72. Dominic Cloyd was housed at the HOC from October 2012 until February 2013, so he was not there at the same time as the plaintiff. Courtney B. Williams was housed at the HOC from September 30, 2012, until April 16, 2013; again, he was also not there at the same time as the plaintiff.

Raymond Todd Johnson was housed at the HOC from August 2013 until March 2014. Dkt. No. 72 at 2. He stated that during that time period, he was "housed on K-6, M-6, L-6, P-6, Q-6, R-6, B-2, O-2 was the hole and it was extremely cold and we were not allowed blankets, so was Jack-2 and L-6." Id. He alleged that he was housed in dorms where it was "so cold that you could see your breath in smoke." Id. at 1. He also stated that he was not allowed to have an extra blanket despite the cold, and that officers "tried to punish us for wearing blankets in the dayroom area while attempting to stay warm." Id. at 2.

The defendants discount Johnson's affidavit because he and the plaintiff were not on the same unit at the same time. While it is true that Johnson does not allege that he was in D-2 (where the plaintiff was housed) at any time

34

during his confinement at the HOC, he was incarcerated at the facility during the same time that the plaintiff was, and his allegations that the dorms were cold and that the inmates were not allowed to wear blankets in the dayroom mirror the plaintiff's claims. The plaintiff's allegations, and Johnson's affidavit, contrast with the defendants' averments that it was not cold at the HOC during the same time period. These differences demonstrate that there is a genuine dispute between the parties as to a material fact—whether conditions at the HOC were sufficiently serious to satisfy the objective prong of an Eighth Amendment conditions of confinement claim. See Dixon, 114 F.3d at 644. The court then turns to whether the defendants acted with deliberate indifference.

It is undisputed that, as command staff, Hafemann, Hernandez and McKenzie did not personally participate in evaluating or responding to complaints that housing unit temperatures were too cold. Section 1983 "does not allow actions against individuals merely for their supervisory role of others," so a prison official cannot incur liability unless he was personally involved in the alleged deprivation. Palmer v. Marion Cnty., 327 F.3d 588, 594 (7th Cir. 2003). Though direct participation is not required, "there must at least be a showing that the [defendants] acquiesced in some demonstrable way in the alleged constitutional violation." Id. The plaintiff has not presented any evidence that Hafemann, Hernandez or McKenzie knew of his complaints about the cold, denied him blankets or had any other involvement regarding the

35

temperatures in his dorm. The court will grant summary judgment in favor of these defendants on the conditions-of-confinement claim.

With regard to defendant Goss, it is undisputed that on January 1, 2014,[5] Goss directed the plaintiff to return to his cell if wanted to keep his blanket wrapped around him. Dkt. No. 58 at 3. She told him that, because of institution security and safety issues, inmates were not allowed have their blankets in the common area. Id. The plaintiff refused to remove the blanket or go to his bunk, and protested having been moved to the D2 housing unit. Id. In the fact of his continued refusal to remove the blanket or go to his bunk, as well as his refusal to submit a written request for medical care, Goss issued the Rules Violation. Id. at 4-5.

The evidence indicates that Goss did not observe the housing unit to be unusually or excessively cold, and that she had not received complaints of unusual or excessive cold from other inmates. Id. at 2-3. Even if the housing unit had been cold on that day, Goss provided the plaintiff the opportunity to use his blanket in his bunk area to feel warmer. Id. at 3. These facts do not support a finding that defendant Goss acted with deliberate indifference. See

_____

[5] The defendants presented evidence that the plaintiff had five separate housing assignments on January 1, 2014. It is not clear how, but on that single day, he was on Unit U6, Unit Q6, had two cell assignments on Unit D2, and was on Unit B2. Dkt. No. 59 ¶ 19. The evidence indicated that during the plaintiff's assignment to Unit U6, that unit had a recorded temperature range of 72-74 on that date, and during his assignment to unit Q6, it had a recorded temperature range of 72-75. Id. ¶ 20. Computerized temperature data wasn't recorded for the D2 unit during the relevant time period. Id. ¶ 13.

36

Dace v. Smith-Vasquez, 658 F. Supp. 2d 865, 880–81 (S.D. Ill. 2009) (finding lack of deliberate indifference where plaintiff had clothing and bedding in his cell and defendants made efforts to correct the situation by submitting work orders); Hagemann v. Schmitz, 10-CV-26, 2011 WL 38996, at *3-5 (Griesbach, J.) (finding lack of deliberate indifference where defendants responded to plaintiff's complaints and monitored temperature of the area).

Moreover, to the extent that the plaintiff alleges that his medical issues were due to cold temperatures, he has presented no evidence which supports that fact. The plaintiff's medical records do not demonstrate a causal link between the alleged cold conditions at the HOC and the plaintiff's medical symptoms. See Dixon, 114 F.3d at 645 (holding that prisoner's "conclusory allegations, without backing from medical or scientific sources" that inadequate ventilation caused him respiratory problems were insufficient to overcome summary judgment on Eighth Amendment claims).

Despite any factual dispute as to whether it was or was not unusually cold on the D2 unit on January 1, 2014, the plaintiff has presented no evidence that defendant Goss was deliberately indifferent to his claims that he was cold; he only has demonstrated that he could not stay in the dayroom if he wanted to remain wrapped in his blanket. The court will grant summary judgment in favor of defendant Goss on the conditions-of-confinement claim.

37

        *iii.*    *The plaintiff has not established an*
                       *official capacity claim based on*
                       *Milwaukee County policy.*

The only evidence provided in the record reveals that Milwaukee County policy and practice is to ensure the adequate warmth and safety of HOC inmates. While the HOC previously had limited sensors to read and records housing unit temperatures, today all HOC housing units are equipped with sensors that read housing unit temperatures and record the data in computerized fashion. The plaintiff has not established that any Milwaukee County policy or practice deprived him of adequate warmth; thus, he has not demonstrated any official capacity claims. See Hill v. Shelander, 924 F.2d 1370, 1372 (7th Cir. 1991).

Based on the foregoing, the court will grant the defendants' motions for summary judgment on the conditions of confinement claim.

## II.     The Plaintiff's Motion to File a Sur-Reply

On January 8, 2016, the plaintiff filed a motion to file a sur-reply in opposition to the defendants' motions for summary judgment. Dkt. No. 100. He stated that the defendants' reply brief (he doesn't say which one) appeared to reflect a number of misunderstandings about the facts of the case, the controlling law, and this court's procedures. He asked the court to allow him to file a short sur-reply to alleviate any confusion or misunderstanding that had arisen from the defendants' reply brief.

The plaintiff attached his sur-reply to his motion, Dkt. No. 100-1, and the court has read it. The court will deny the request to file a sur-reply. First, neither the Federal Rules of Civil Procedure nor this court's Local Rules provide for a plaintiff to sur-reply. Second, although the court has the discretion to allow additional summary judgment filings and may do so under unique circumstances, those unique circumstances do not exist here. The plaintiff's proposed sur-reply consists of the plaintiff's contention that the defendants have misunderstood what he has and has not done. As indicated by the court's conclusions above, the court disagrees.

III.   **Conclusion**

The court **GRANTS** defendants Armor Correctional Health Service, Inc., Elftman and Xiong's motion for summary judgment. (Dkt. No. 40)

The court **GRANTS** defendant Dr. Gable's motion for summary judgment. (Dkt. No. 45)

The court **GRANTS** defendants Goss, Hafemann, Hernandez, McKenzie and Milwaukee County House of Corrections' motion for summary judgment. (Dkt. No. 52)

The court **DENIES** the plaintiff's motion for leave to file sur-reply. (Dkt. No. 100)

The court **ORDERS** that the clerk enter judgment on behalf of the

defendants, and that the complaint in this case is **DISMISSED.**

Dated in Milwaukee, Wisconsin this 15th day of March, 2016.

BY THE COURT:

HON. PAMELA PEPPER
United States District Judge